## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **WILLIAM F. PERKINS, in his capacity** | ) | |
| **as Chapter 11 Trustee of International** | ) | |
| **Management Associates, LLC and its** | ) | |
| **affiliated debtors,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action File No.** |
| | ) | **1:08-CV-02673-JEC** |
| **v.** | ) | |
| | ) | |
| **SMITH, GAMBRELL & RUSSELL, LLP** | ) | |
| **and C. GLADWYN GOINS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## EXPERT REPORT
## OF PROFESSOR JOHN C. COATES, IV

Plaintiff hereby files the Expert Report of Professor John C. Coates, IV which is attached.

This 18th day of May, 2009

/s/Robert E. Shields_____
Robert E. Shields
Georgia Bar No. 642725

DOFFERMYRE, SHIELDS, CANFIELD &
KNOWLES, LLC
Suite 1600
1355 Peachtree Street
Atlanta, Georgia 30309
(404) 881-8900
rshields@dsckd.com
edoffermyre@dsckd.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **In re:** | : |
| | : |
| **WILLIAM F. PERKINS, in his capacity as** | : |
| **Chapter 11 Trustee of International** | : |
| **Management Associates, LLC and its** | : |
| **affiliated debtors,** | : **Civil Action File No.** |
| | : **1:08-CV-02673-JEC** |
| **Plaintiff,** | : |
| **v.** | : |
| | : |
| **SMITH GAMBRELL & RUSSELL, LLP** | : |
| **AND C. GLADWYN GOINS,** | : **EXPERT REPORT OF** |
| | : **PROFESSOR JOHN C. COATES IV** |
| **Defendants.** | : |

## I.   Summary of Conclusions

1. I have been asked by Counsel for William F. Perkins, in his capacity as Chapter 11 Trustee (***plaintiff***) whether the conduct of the law firm of Smith, Gambrell & Russell, LLP (***Smith Gambrell***) and the individual defendants who were attorneys at Smith Gambrell in the relevant time period, including C. Gladwyn Goins (***Goins***) (collectively ***the Law Firm Defendants***) complied with the applicable standard of care for professional attorneys in their work for International Management Associates, LLC (***IMA***) and the related IMA entities that are debtors in this matter.

2. I am a professor of law and economics at Harvard Law School specializing in financial institution regulation, and formerly a law firm partner at Wachtell, Lipton, Rosen & Katz specializing in representing financial institutions. Based on my research, experience and analysis, I have come to the following conclusions:

   (a)   The Law Firm Defendants failed to comply with the applicable standards of care by failing to gain an adequate understanding of the client's business, operations, methods and internal controls necessary to carry out the engagement that the Law Firm Defendants had agreed to perform for the client, including implementation of a compliance system and instruction of appropriate staff with respect to compliance obligations regarding (and legal effects of) commingling of client funds.

   (b)   The Law Firm Defendants failed to comply with the applicable standards of care by preparing offering memoranda for IMA and investment funds sponsored by IMA that included (among other things) the false and misleading statement that IMA would "cause to be prepared and sent to each [investor] … [a]fter the end of each Fiscal Year, audited financial statements…."

   (c)   The Law Firm Defendants failed to comply with the applicable standards of care by communicating with the SEC and state regulatory officials in a false and misleading way on behalf of IMA.

3. Part II of my report summarizes my qualifications and assignment, the relevant standard of care, and materials reviewed. Part III states relevant facts. Part IV sets forth my analyses and opinions.

## II.   Qualifications, Assignment, and Materials Reviewed

A.   Qualifications

4. I am the John F. Cogan Jr. Professor of Law and Economics at the Harvard Law School. At Harvard I research and teach courses on financial institutions and financial institutions regulation, the management of professional service firms (including law firms), and seminars on advanced topics in financial institutions, including units on the basis of accounting and finance, option theory, econometrics and statistical theory, decision theory, and efficient markets theory and related academic research. A copy of my *curriculum vitae* is attached as Exhibit A.

5. Before joining the Harvard faculty, I was a partner at the New York law firm of Wachtell, Lipton, Rosen & Katz, where I specialized in financial institutions, including commercial and investment banks, broker-dealers, investment advisers, insurance companies, and investment companies.[1] I worked at Wachtell Lipton from 1988 to 1997.

6. Since joining Harvard Law School, I have provided and continue to provide consulting services to the Securities and Exchange Commission (*SEC*) in connection with an enforcement proceeding under the securities laws against a registered investment company under the Investment Advisers Act of 1940 and the Investment Company Act of 1940. I am currently a researcher on the fund industry for the Committee on Capital Markets Regulation, an independent and bipartisan group comprised of 24 leaders from the investor community, business, finance, law, accounting, and academia.

7. In practice or as a consultant, I have provided consulting services to private equity funds, hedge funds, mutual funds, public and private companies, law firms, and investment banks, regulatory agencies, trade organizations, and entrepreneurs, including Goldman, Sachs & Co., Bank of America, CS First Boston, Merrill Lynch, John Nuveen, Capital One, State Street, Massachusetts Financial Services, and Fidelity.

8. I will receive my customary fee of $950 per hour for time spent on this litigation, including preparing this report and preparing and giving associated testimony. Through the date of this report, I estimate that I have earned approximately $40,000 in connection with the preparation of this report. I understand I may be asked to give further testimony or opinions in this case. In addition, discovery in this matter continues, and thus my own investigation and analysis of these matters continues, and I reserve the right to supplement or amend my report on the basis of my ongoing work as necessary.

B.   Assignment

9. I have been requested by counsel for Plaintiff William F. Perkins to provide an opinion about whether the Law Firm Defendants complied with the applicable standard of care

---

[1] To my knowledge, I have not previously provided services to the named parties to this case, whether as an attorney, consultant or expert witness.

3

for professional attorneys in their work for IMA and the related IMA entities referenced as debtors in this matter.

C.     Standard of Care

10. I understand that a professional attorney has a duty to use such ability, care and skill as lawyers of ordinary skill and capacity commonly possess and use in the performance of the tasks they undertake, and that in the practice of the legal profession, there is a presumption that legal services are performed in an ordinarily skillful manner.

D.     Materials Reviewed

11. I have reviewed the following documents for purposes of this report:

   a.   The documents provided by Smith Gambrell in response to a subpoena and request for production of documents from William F. Perkins in this Chapter 11 Proceeding.

   b.   The documents provided by Smith Gambrell in response to a request by the Federal Bureau of Investigation.

   c.   The documents in the possession of IMA and now held by William F. Perkins pursuant to this Chapter 11 Proceeding.

   d.   Additional documents identified in Exhibit B.

## III.   Facts

12. At all relevant times, IMA was a small company, with fewer than 25 employees. It had no full-time lawyers working as employees, no internal audit function, and no formal board of directors.

13. Pursuant to engagement letters dated December 26, 2000, September 11, 2001, July 15, 2002, and September 17, 2002, the Law Firm Defendants agreed to provide legal services to IMA. In these letters:

   a.   The Law Firm Defendants agreed to provide, among other things, services in representing IMA and its employees in connection with an SEC investigation of IMA and, more generally, to "serve as counsel" to IMA.

   b.   Among the services discussed by IMA and Smith Gambrell were "corporate, investment advisory, securities, corporate governance, employment law and litigation" services.

   c.   Smith Gambrell agreed to "devise and implement a compliance system applicable to a federally registered investment adviser, to include, among other things, an

4

operation review," "instruction to the appropriate staff," and filing of a
registration on Form ADV with the SEC.

14. The Law Firm Defendants did in fact carry out services in these areas. Smith Gambrell
served as IMA's primary counsel from at least 2000 through 2006, and represented IMA
in a variety of matters.[2]  During this period, no law firm provided more legal services to
IMA than Smith Gambrell.

15. After agreeing in its July 15, 2002 engagement letter to "devise and implement a
compliance system," Smith Gambrell designated Gladwyn Goins, who had recently
joined Smith Gambrell and had no prior relationship with IMA, to carry out this and
related tasks. Goins was an experienced securities lawyer, having spent many years at
the SEC in a variety of positions.

16. Despite having been charged with implementing IMA's compliance system, Goins was
never shown, and Goins never reviewed, documents relating to a prior SEC investigation
of IMA and Kirk S. Wright (***Wright***), or the testimony of Wright in connection with that
investigation.  Instead, Goins relied on a brief and cursory oral description of the
investigation and its outcome provided by another lawyer at Smith Gambrell, Jacob
Frenkel.

17. On July 24, 2002, Goins sent IMA a lengthy list of 80 categories of documents that he
stated he would need to be able to carry out the tasks listed in the July 15, 2002
engagement letter.[3]  Goins testified that he knew that Wright and others at IMA had
concerns that IMA might not be in compliance with regulatory compliance and with
counsel that had previously advised IMA on such matters.  Goins also testified that he
found deficiencies in the documents he was provided in response to his request.[4]

18. During the course of his compliance review in August 2002 or thereafter, Goins claims to
have been led down into a basement storage room by Doctor Fitz Harper, where Goins
was given access to and reviewed "boxes" of brokerage account statements showing
separate, non-commingled accounts for each of IMA's advisory fund clients.[5]  However,
no such statements have ever been produced, by IMA, by Smith Gambrell, or anyone
else.  Doctor Harper has testified that neither he nor Doctor Bond had access to brokerage
statements.[6]  Moreover, given the limited number of brokerage accounts that IMA and its
funds ever had open, and the limited number of statements – which, as Goins himself
testified, were typically issued monthly or quarterly – it is implausible that IMA could
ever have had "boxes" of such statements.  While boxes of trade confirmations may have
existed and been shown to Goins, such statements would not be an adequate substitute for

---

[2] See, e.g., Goins Dep. Tr. Exhibit 7 (December 26, 2000 engagement letter between IMA and Smith Gambrell);
IMA-SGR019737 (invoice from Smith Gambrell to IMA)
[3] Goins Dep. Tr. at 115-16.  Goins claims that he spent "several hours" preparing the list, id. at 121, but it appears to
be a boilerplate list that is in no apparent way tailored to IMA or its particular situation.  Exhibit 11 to Goins Dep.
[4] Id. at 136.  Goins claims to have taken notes detailing his review of documents and related deficiencies, id., but no
such notes have been produced by Goins or Smith Gambrell.
[5] Goins Dep. Tr. at 146-47.
[6] Harper Dep. Tr. at 71-72, 76.

brokerage account statements, as they would not document the number of client accounts maintained by IMA for its clients, and would not reveal commingling of client funds. Goins also testified that he saw separate bank accounts for the funds,[7] yet no such accounts existed in 2002[8] – a fact that Goins also admits that "would have been a matter of concern."[9] In fact, since there were no separate bank accounts for IMA and its funds, it follows as a matter of logic that IMA used its clients' assets to pay for its own ordinary operations and other expenses.

19. Goins testified that in the course of his compliance work for IMA, he was told IMA had audited financial statements, but that they were not "onsite" and would be provided subsequently.[10] However, he also testified that he recommended to IMA that IMA obtain audited financial statements for its funds, a recommendation he made "near the ... beginning of the engagement,"[11] and that he knew that IMA itself did not have audited financial statements, but was merely "working toward trying to obtain" such statements.[12] Despite this, he was never given audited financial statements – either for IMA or its funds. Indeed, neither IMA nor its funds ever had audited financial statements. Goins himself also testified that he knew that IMA's funds never had audited financial statements – knowledge that he had even while assisting IMA in revising IMA's private placement memoranda in the latter part of 2002 and/or the early part of 2003 – and that he "knew that [IMA itself was] working toward trying to obtain audited financial statements."[13] Nor did IMA have or develop any meaningful control systems – no internal policies requiring, for example, approval from multiple officers or employees to approve expenditures, open bank accounts, transfer funds, or the like. This was true prior to Goins's engagement, during his engagement, and thereafter.

20. Goins and Smith Gambrell drafted IMA's PPMs in early 2003.[14] In those PPMs, there is no disclosure of the fact that the funds did not have audited financial statements. Instead, there is a statement that the funds would provide audited financial statements to its investors annually.[15] No such audited financial statements were ever prepared or provided to IMA's fund investors. IMA never in fact engaged an audit firm to obtain

---

[7] Goins Dep. Tr. at 151-52.

[8] Tr. of Jury Trial Proceedings, May 12 and 13, 2008 (Test. of Wiliam F. Perkins), at 32, 61

[9] Id.

[10] Goins Dep. Tr. at 148-50.

[11] Goins Dep. Tr. at 167. Goins testified variously that this recommendation was in writing, or orally documented by a memo, or orally documented by handwritten notes, or in a phone conversation documented by handwritten notes, which in turn he testified he left in his files at Smith Gambrell. No such writing has been produced. In addition, Goins testified that he believed that the private placement memoranda (*PPMs*) discussed below contained a "reference to ... the requirement or suggestion that the audited financial statements for that fund would be obtained or achieved." Id. at 168-69. No such "reference" exists; as discussed below, the PPMs contain a commitment by IMA to provide audited financial statements annually to investors, but nowhere refer to Smith Gambrell, Goins, or any "requirement or suggestion" from the law firm that the audited financial statements should be prepared. It is stretching beyond plausibility for Goins to suggest that a false or misleading commitment in PPM that a lawyer authors on behalf of a client is appropriately viewed as written evidence of a recommendation by the lawyer to the client to carry out the task the PPM commits the client to carry out.

[12] Goins Dep. Tr. at 371-72.

[13] Goins Dep. Tr. at 371.

[14] Goins Dep. Tr. Exhibit 23, Dep. Tr. at 320.

[15] E.g., Goins Dep. Tr. Exhibit 24.

6

audited financial statements for its funds. Instead, it engaged the Ashland firm to conduct a review consistent with performance presentation standards established by the Association for Investment Management and Research (*AIMR*), which are far less extensive than an audit carried out under generally accepted auditing standards and which – as Goins himself testified[16] – would consist solely of a review of IMA's "methodology" for determining its investment performance, and thus would provide investors with no assurance that the assets claimed to be held on a fund's behalf by IMA were in fact held by IMA. Nor did the PPMs disclose that IMA had been commingling assets of the various funds it advised. Instead, the PPMs stated that "custody of the assets of the Fund will be held with Fidelity Investments, and the prime broker selected by the Manager."[17] In fact, during 2002 and 2003, the assets of the funds were held in a commingled fashion by IMA, and the accounts IMA established at Fidelity and its prime brokers were in its name (or in the name of Wright or individual investors), not for the separate funds.[18]

21. During 2003, Goins was significantly involved in the business of IMA. He participated in the preparation of marketing brochures for IMA,[19] including one that grossly overstated the amount of assets managed by IMA, even when he had in hand documents showing that IMA was managing roughly half the amount stated in the brochure.[20] In addition, he drafted proposals for the expansion of IMA's business into mutual fund advisory services marketed to a life insurance company,[21] undertook to draft a business plan,[22] and participated in marketing efforts (including at the Kentucky Derby) and calls to prospective institutional investors.[23]

22. Goins was aware that the Ashland firm had discovered discrepancies in reviewing performance data for IMA.[24]

23. Goins testified that he provide advice to IMA regarding state registration requirements for investment advisers, as part of a "continuous process."[25] Goins knew that IMA was required to be registered in states, such as Utah, that required audited financial statements for registered advisers, even as he knew that IMA did not have audited financial statements, but were merely "working toward trying to obtain" such statements.[26] Goins was aware that IMA was in violation of Texas and New York state law requiring a certification or an audited balance sheet.[27]

---

[16] Goins Dep. Tr. at 166-67.
[17] E.g., Goins Dep. Tr. Exhibit 24 at 5.
[18] Tr. of Jury Trial Proceedings, May 12 and 13, 2008 (Test. of Wiliam F. Perkins), at 31
[19] SGR024326. Goins testified that he did not draft market brochures, but merely "reviewed them," Dep. Tr. at 295 and 312-20, despite language in accompanying emails that make it clear that he was personally making changes in the draft documents. Id.
[20] Goins Dep. Exhibit 42.
[21] DR_BOND_01932.
[22] SGR020861.
[23] HAYSBOND001495. Goins Dep. Tr. 350-54.
[24] Goins Dep. Tr. at 347-48.
[25] Dep. Tr. at 367-68.
[26] Goins Dep. Tr. at 371-72.
[27] Goins Dep. Tr. at 373-76.

24. During the summer of 2003, Goins and Smith Gambrell responded on behalf of IMA to inquiries from the SEC.[28]  Goins testified that he personally called Wright to obtain documentation of the assets managed by IMA to provide to the SEC, and that the documents that Wright had faxed to Goins did not identify separate accounts for each of the IMA-advised funds.  Goins also testified that he anticipated that the SEC staff would ask whether the accounts were so-called "omnibus accounts," in which client funds would be commingled at the brokerage firms, and as a result he called Fidelity and JB Oxford.  Goins claims that each brokerage's account representatives told him that the IMA account was an "omnibus account" with separate subaccounts maintained by the brokerage firms, and that the account representative at JB Oxford did not ask any questions or respond in any way when told an amount under management that was vastly higher than the actual amount reflected on the brokerage's own books and records.  Yet the account statements that Goins provided to the SEC on behalf of IMA did not reflect separate accounts for IMA funds, but a single IMA account, nor do they indicate that the statements were for omnibus accounts.[29]  This was also true of all of the other brokerage statements the brokerage firms ever sent to IMA.  In fact, the accounts never were "omnibus accounts" maintained as such by Fidelity or JB Oxford.  In other words, IMA was commingling its funds' assets rather than maintaining separate brokerage accounts for the funds it advised and was maintaining its clients' assets in its own name.  All this was evident from the face of the brokerage statements submitted by Goins to the SEC.

25. Goins and Smith Gambrell also represented IMA in connection with an inquiry from the State of Georgia's Division of Securities during the summer of 2003.[30]  In his written letter to the Division, Goins referred not once (as might be explained as a "typo," as Goins suggested in his deposition), but four times in three separate paragraphs to IMA Platinum Group, LLC as an advisor, when in fact Goins knew (and believed) that IMA was the advisor.  In fact, Goins testified that "there was, as far as I knew, no such thing as [IMA] Platinum Group, LLC."[31]  The same letter falsely states that IMA had "succeeded to the business of … [its] predecessor … [u]pon being declared effective earlier this year [i.e., 2003]," when in fact IMA had been advising the IMA funds since at least August 2002, as reflected on documents addressed to Goins from that period.[32]

26. In April 19, 2005, after Goins left Smith Gambrell, he wrote a memo to IMA.[33]  In it he stated that if IMA registered with the SEC, which could be required by rules being considered by the SEC at the time, the "likely result" would be "an enforcement action by the Division of Enforcement [of the SEC] alleging violations" of various provisions of the federal and state securities laws.  Among the violations Goins anticipated would be violations of the antifraud provisions of the federal securities laws.  Importantly, nothing in the rules being considered by the SEC would have changed the application of the antifraud provisions of the Securities Exchange Act of 1934, which applied then (and

---

[28] Goins Dep. Tr. at 420-57
[29] See Goins Dep. Exhibit 53.
[30] IMA-SGR019923.
[31] Goins Dep. Tr. at 461
[32] E.g., HAYSHARPER04830.
[33] Goins Dep. Exhibit 83 (Dr. Bond 05468).

apply now) to all securities transactions regardless of whether the parties to the transactions were or are required to be registered with the SEC. The memo also specifically lists "custody of assets" as the basis for a "likely" enforcement action by the SEC under the Investment Advisers Act of 1940.

27. Also important to note, Goins's 2005 memo explicitly states: "Issues related to the [likely enforcement actions] date from at least 1998 through the present." It goes on to say that he had "discussed from time to time" the need for IMA to take corrective action. The memo also acknowledges the "investigative history" of IMA. Goins's memo makes clear both that he had prior knowledge of facts that led him to believe that an SEC antifraud action would be likely if IMA were to be examined by the SEC, and that this knowledge existed during the time that Goins was an attorney at Smith Gambrell.

## IV.    Analyses and Opinions

28. It is my opinion that the Law Firm Defendants failed to perform basic duties and undertakings that an attorney, exercising ordinary care, skill and diligence, would have performed in carrying out the services they undertook on behalf of IMA.

29. General Observations. Before reviewing and analyzing the specific facts that support my general opinion, I review some general considerations that bear on the analysis.

30. First, it is undisputed that IMA was a small firm that had been formed only a few years prior to the engagement of the Law Firm Defendants. In general, smaller, early-stage businesses are more apt to make legal mistakes and violate both laws and good operating practices than are older, larger firms. Law firms should and do take more care with such clients.

31. Second, it is undisputed that the managers of IMA had relatively limited managerial experience. In general, managers with less experience tend to commit more legal violations than more experienced managers, if only out of lack of knowledge. Law firms should and do take more care with such clients.

32. Third, it is undisputed that IMA's principal business was money management: raising money from investors and investing that money in securities. In general, money management firms present opportunities for fraud and embezzlement that are more serious, and their customers are more vulnerable, than is true for companies engaged in other kinds of businesses, where (for example) investor funds are used to purchase fixed property, plant and equipment that cannot easily be converted by employees for their own use. This is part of the reason that financial services are more heavily regulated than many other businesses. Law firms should and do take more care with such clients.

33. Fourth, it is undisputed that IMA had no internal counsel, compliance officer, or controller – no full time legally or specially trained employees who could carry on routine compliance, control, and monitoring tasks. In general, companies that lack such employees are more dependent on outside law firms for routine advice on compliance,

9

basic controls systems, and routine communications with regulatory officials. Law firms working for such firms should and do take more care with such clients.

34. Fifth, it is undisputed that the Law Firm Defendants were the primary legal advisors to IMA and its funds. As such, the Law Firm Defendants knew that no one else would either provide legal advice or follow-up to see that legal advice was followed at IMA. Combined with the lack of in-house counsel, this also meant that there was no "hub" at the center of a multi-lawyer set of relationships other than the primary lawyer working for IMA at Smith Gambrell: if information was going to be shared among the lawyers working for IMA, it would have to be shared within Smith Gambrell, and not between one lawyer at Smith Gambrell, on the one hand, and another lawyer at Smith Gambrell, on the other hand.

35. Sixth, firms with a past history of being investigated by regulatory bodies have reason to act with even more care than other firms. Here, IMA and Wright had previously been investigated by the SEC. As a result, the Law Firm Defendants should have conducted their review in August 2002 and thereafter with even more care than they might have otherwise done. Yet Goins was never told or otherwise obtained the details about the prior SEC investigation by his fellow attorneys at Smith Gambrell.

36. The attorneys at Smith Gambrell, including Goins, had sufficient experience that they should have known all of the foregoing, and taken it into account in carrying out their professional duties.

37. Specific Opinions. The facts recited above show that the Law Firm Defendants failed in crucial aspects to carry out the tasks set out in the July 15, 2002 engagement letter, including (i) gaining the detailed understanding of the client's business, operations, methods and internal controls necessary to "devise and implement a compliance system" for an investment adviser and broker-dealer, (ii) conducting a successful "operational review," and (iii) successfully instructing the "appropriate staff" of IMA regarding compliance obligations. In particular, the Law Firm Defendants did not obtain the basic documents necessary to verify that IMA was not already acting in violation of basic legal duties – despite finding deficiencies in the documents that they did review.

38. Since IMA never had separate bank accounts and brokerage accounts for its fund-clients, the Law Firm Defendants could not have reviewed them – Goins's testimony to the contrary notwithstanding. Had Goins in fact reviewed IMA's bank and brokerage statements, as he claims he did, and as would be required by even a minimal attention to an attorney's obligations in the context of a compliance and operational review, he would have discovered that IMA was commingling its clients money with its own, and thus was spending client money to pay for its ongoing operations.

39. Commingling funds in such an egregious manner violates basic corporate law principles – which pin the limited liability of investors in a corporate enterprise (including a limited liability company) on the lack of such commingling. Commingling also violates basic fiduciary principles applicable to investment managers who possess discretion over client

assets. As Goins himself admits, the realization that IMA was breaching such basic duties would have immediately triggered other questions – such as how the clients' funds were being used – and would have led a responsible attorney to inform all of the principals of IMA (not just Wright) that they faced serious personal liability for this practice, and to cease representing IMA if the practice were not ended.

40. Had an operational and compliance review undertaken by the Law Firm Defendants been conducted as it should have been, the discovery of commingling would have led to a detailed review of the brokerage statements – instead of the statements remaining within the sole control of Wright. It would have become apparent, in my opinion, that Wright was engaged in a scheme to embezzle funds and otherwise breach his legal duties.

41. The Law Firm Defendants also failed to conduct its operational and compliance review with requisite care by failing to maintain records of what documents it did review, what deficiencies it found, how the deficiencies were corrected, and how it recommended that IMA avoid similar deficiencies in the future.

42. The Law Firm Defendants also failed to perform basic duties and undertakings that an attorney, exercising ordinary care, skill and diligence, would perform in preparing the PPM for IMA and its four investment funds, resulting in (among other things) the inclusion of false and materially misleading statements that IMA would "cause to be prepared and sent to each [investor]: … [a]fter the end of each Fiscal Year, audited financial statements…." and that each fund would have its own account at Fidelity and the prime broker chosen by IMA.

43. Even if one were to read the statement regarding audited financials to be about the future, it was still materially misleading for IMA to include such a commitment in its PPMs while omitting to state that it had not engaged any auditor to prepare such financial statements, and that there could be no assurance that any such auditor could be found to accept and complete such an assignment. The interests offered by the funds through the PPMs were securities. SEC Rule 10b-5 applies to all sales of securities. Rule 10b-5 not only forbids issuers from affirmatively lying (or making promises they do not intend to keep), but also forbids them from *omitting* statements necessary to prevent statements actually made from being misleading. Any reasonable investor reading that IMA would cause audited financials to be sent to each investor would believe that IMA had an audit firm prepared to carry out an audit – absent disclosures to the contrary. Even on that ground alone, the Law Firm Defendants directly contributed to the deception by the IMA funds of their investors, and failed to adhere to their professional duties.

44. Moreover, the Law Firm Defendants knew that IMA was not pursuing a full audit – and instead was pursuing a performance measurement review by Ashland. Whether or not Goins recommended Ashland's services in lieu of an audit – and the evidence I have reviewed tends to suggest that he did, his sworn testimony to the contrary notwithstanding – it is nonetheless clear that Goins knew that IMA was working with Ashland through Smith Gambrell, and that IMA had not involved him or Smith Gambrell

in any similar capacity to pursue a full audit in compliance with generally accepted auditing standards, either for IMA itself or the funds.

45. The Law Firm Defendants' knowledge and participation in fraudulent and/or deceptive behavior prohibited by the federal securities laws is made clear by the April 19, 2005 memo from Goins to Drs. Harper and Bond and Wright, discussed above. Regardless of the specific behavior that Goins had in mind while writing that memo, he specifically identifies "antifraud provisions" as a "likely" basis for an SEC enforcement action, based on "issues" dating "from at least 1998 through the present [i.e., 2005]," during the period in which the Law Firm Defendants were representing IMA. The memo also specifically refers to "likely" enforcement action based on provisions of the Investment Advisers Act related to "custody of assets," which suggests that the Law Firm Defendants did not simply fail to act with requisite diligence in discovering the commingling, fraud and embezzlement by Wright, but that they were aware that client assets were not being maintained for the benefit of customers, as required by law. (The memo also discusses other "likely" violations, discussion of which I omit for brevity.)

46. The Law Firm Defendants failed to perform basic duties and undertakings that an attorney, exercising ordinary care, skill and diligence, would perform in communicating, on IMA's behalf, with various regulatory officials, including the SEC, the Georgia Division of Finance, and other state regulatory officials. Among the misleading communications sent on behalf of IMA were:

    a. The Law Firm Defendants passed along relatively short and simple statements purportedly from Fidelity Investments and JB Oxford that had been fabricated by Wright, which contained internal discrepancies that were apparent on the face of the statements, which were directly responsive to information requested by the SEC, and which also revealed on their face the commingling of client funds. As the Law Firm Defendants knew, neither IMA nor any of its funds had been audited; Ashland had not completed its more limited review; IMA had previously been the subject of an SEC investigation; and IMA did not have a controller, internal accounting officer, or internal legal counsel. They also knew or should have known (had they adequately carried out their compliance and operational review), IMA had no reasonably adequate system of internal controls. Goins also should have known that the letter purportedly sent by Fidelity Investments to Goins was not sent directly by Fidelity to Goins but by IMA, and bore no fax number or other markings indicating an origin from Fidelity, and that the statements from Fidelity and JB Oxford contained significant and obvious inconsistencies apparent from cursory review. Moreover, the inconsistencies concerned information directly relevant to the SEC's inquiry.

    b. In an apparent attempt to cover up the fact that IMA had been operating without a requisite registration in Georgia – itself a separate failure of the Law Firm Defendants failure to carry out their obligations to advise on and help IMA respond to its legal obligations the Law Firm Defendants falsely told the Georgia Division of Securities that IMA had only recently succeeded to the business of an

12

entity that Goins says never existed, when in fact Goins knew that IMA had been operating since at least August 2002 without registering.

47. Had the Law Firm Defendants complied with the applicable standard of care for professional attorneys in their work for IMA and the related IMA entities, the fact that Wright was engaged in a scheme to embezzle funds and otherwise breach his legal duties would have been discovered long before it was.

_____
Professor John C. Coates IV

Dated:  May 18, 2009

13

**Exhibit A**

## JOHN C. COATES IV

22 Thayer Street
Brookline, Massachusetts  02445
(617) 496-4420 (office tel)
(617) 496-5156 (office fax)
jcoates@law.harvard.edu (email)

EXPERIENCE

<u>Harvard Law School</u>, Cambridge, MA

| | |
|---|---|
| John F. Cogan Jr. Professor of Law and Economics | 6/06 - Present |
| Professor of Law | 6/01 – 6/06 |
| Assistant Professor of Law | 6/97 - 6/01 |

    Teaching Corporations, Mergers & Acquisitions, Contracts,
    Financial Institutions Regulation, and advanced seminars

<u>Securities and Exchange Commission</u>, Washington, D.C.

| | |
|---|---|
| Independent Distribution Consultant | 5/04 - Present |

<u>Wachtell, Lipton, Rosen & Katz</u>, NYC

| | |
|---|---|
| Partner | 1/96 - 5/97 |
| Associate (Full- or Part-Time) | 3/88 - 12/95 |

    Specialized in corporate, securities, M&A, and financial
    institutions law and regulation

    Managed legal work for large corporate mergers and acquisitions,
    recapitalizations, buyouts, freezeouts, and public offerings

    Advised participants in proxy fights, auctions, and hostile takeovers

    Managed disclosure and compliance "crises" at  public companies,
    particularly financial institutions

<u>New York University School of Law</u>, NYC

| | |
|---|---|
| Visiting Professor | 7/05 – 12/05 |
| Adjunct Assistant Professor | 1/93 -5/97 |
| Lecturer | 1/92 - 12/93 |

<u>Boston University Law School</u>, Boston, MA

| | |
|---|---|
| Lecturer | 1/95 – 6/97 |

14

## MEMBERSHIPS / AFFILIATIONS

| | |
|---|---|
| New York Stock Exchange | Member, Legal Advisory Board |
| American Bar Association | Member, Section on Business Law |
| American Law and Economics Association | Member, Past Member Board of Directors |
| Association of American Law Schools | Member |
| National Bureau of Economic Research | Invited Speaker / Researcher |
| Harvard Business School / Harvard Law School Ad Hoc Group on Corporate Governance | Founding Member |
| Harvard Center on Lawyers and the Professional Services Industry | Founding Member |
| Committee on Capital Market Regulation | Task Force Member and Primary Author |

## EDUCATION

New York University School of Law     J.D. Cum Laude, May 1989

New York University Law Review     1988-89 -- Editorial Board, Articles Editor
  1987-88 -- Staff Member

Law Review Alumni Association Award     Third in Class
George P. Foulk Memorial Award     Scholarship
Pomeroy Prize     Outstanding Academic Performance
Order of the Coif
American Jurisprudence Awards (contracts, procedure, securities)

University of Virginia     B.A. (History), Highest Distinction, May 1986

Thesis: "Christianity, Kingship and a Carolingian Lord"

Younger Prize     Distinction in American History
Jefferson Scholar     Four-year Merit-Based Scholarship
Echols Scholar     Academic and Leadership Merit

15

## PUBLICATIONS

<u>Recent Publications</u>

Reforming the Taxation and Regulation of Mutual Funds: A Comparative Legal and Economic Analysis, __ *J Legal Anal* __ (forthcoming 2009).

Lowering the Cost of Bank Recapitalization, __ *Yale J Reg* __ (forthcoming 2009) (with David Scharfstein)

The Keynote Papers and the Current Financial Crisis, __ *J Acctg Res* __ (forthcoming 2009)

Competition in the Mutual Fund Industry: Evidence and Implications for Policy, 33 *J Corp L* 151 (2007) (with R. Glenn Hubbard)

Separating Myth and Reality in the Sarbanes-Oxley Act, 21 *J Econ. Persp.* 91 (Winter 2007)

Ownership, Takeovers and EU Law: How Contestable Should EU Corporations Be?, in Company and Takeover Law in Europe, eds. E. Wymeersch & G. Ferrarini (Oxford University Press 2004)

The Powerful Antitakeover Force of Staggered Boards: Further Findings and a Reply to Symposium Participants, 55 *Stan L Rev* 885 (2003) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2003 by academics surveyed

The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence and Policy, 54 *Stan. L. Rev* 887 (2002) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2002 by academics surveyed

Explaining Variation in Takeover Defenses: Blame the Lawyers, 89 *Cal L. Rev* 1301 (2001), selected as one of 10 best corporate law articles published during 2002 by academics surveyed

Second-Generation Shareholder Bylaws: Post-*Quickturn* Alternatives, 56 *Bus Law* 1323 (2001) (with Bradley C Faris)

Private vs. Public Choice of Securities Regulation: A Political Cost/Benefit Analysis, 41 *Va J Int'l L* 531 (2001), selected as one of 10 best securities law articles published during 2001 by academics surveyed

A Buy-Side Model of M&A Lockups: Theory and Evidence, 53 *Stan L Rev* 307 (2000) (with Guhan Subramanian)

Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence on Takeover Defenses, 79 *Tex L Rev* 271 (2000), reprinted in 43 *Corp Practice Commentator* 1 (2002) as one of 10 best corporate law articles published in 2001-02 by academics surveyed

Empirical Evidence on Structural Takeover Defenses: Where do We Stand?, 54 *U. Miami L Rev* 783 (2000)

<u>Other Major Publications</u>

Measuring the Domain of Mediating Hierarchy: How Contestable Are US Public Corporations?, 24 *J Corp L* 837 (1999)

"Fair Value" as a Default Rule of Corporate Law: Minority Discounts in Conflict Transactions, 147 *U. Penn. L. Rev.* 1251 (1999), reprinted in 41 Corp. Practice Commentator 1 (2000) and selected as one of 10 best corporate law articles published in 1999-2000 by academics surveyed

Freezeouts, Management Buyouts and Going Private, in *Takeovers & Freezeouts* (eds. M. Lipton & E. Steinberger, Law Journal Seminars-Press 1998)

Reassessing Risk-Based Capital in the 1990s:  Encouraging Consolidation and Productivity, in *Bank Mergers and Acquisitions* (eds  Y  Amihud & G  Miller, Kluwer Academic Publishers 1998)

Annual Survey of Developments in Mergers and Acquisitions of Financial Institutions 1990-1998 (with Herlihy et al.) (co-authored leading annual survey for eight years; privately published)

Acquisitions of Financial Advisory and Investment Management Businesses, 17 Bank & Corp  Gov  L  Rep  8 (Sep. 1996) (with Herlihy et al.)

Concentration Limits:  New Interstate Moves Still Face Minefield of Deposit Cap Statutes, in a Special Report on Interstate Banking, 13 Banking Policy Rep  23 (Aug  15, 1994) (with Neill)

Mergers of Equals:  Achieving a Delicate Balance of Control, 13 Banking Policy Report 1 (Oct. 3, 1994) (with Herlihy et al.)

State Takeover Statutes and Corporate Theory:  The Revival of an Old Debate, 64 N.Y.U. L. Rev. 806 (1989)

Other Publications

The Trouble With Staggered Boards: A Reply to Georgeson's John Wilcox, Corporate Governance Advisor (2002) (with Lucian A  Bebchuk and Guhan Subramanian)

Purchase Accounting Deals: A Look at Pricing Formulas and Allocation Procedures, 15 Banking Policy Report 1 (Nov. 18, 1996) (with Herlihy, et al.)

Takeovers & Freezeouts (L.J. Seminars-Press) (with Lipton et al.)

New Guidance for Freezeouts and MBOs -- Negotiation Strategy Privileged from Disclosure,  Corp  Rep  (Aspen Law & Business (June 1996) (with Rowe)

M&A Strategies, 9 Bank Accounting and Finance 40 (Winter 1995-96) (with Herlihy, et al.)

Bank M&A Preparedness, 66 Corp. Rep. 1 (Aspen Law & Business Nov. 15, 1995) (with Herlihy, et al.)

Mergers and Acquisitions of Financial Institutions -- 1995: An Unprecedented Year of Consolidation, Securities Activities of Banks, Fifteenth Annual Institute (1995) (with Herlihy, et al.)

Deal Developments Update, Corporate Control Alert (August 1995) (with Herlihy et al.)

Updating the Use of Special Committees in Freeze-Outs and Other Conflict Transactions, Corp. Rep. (Aspen Law & Business Aug. 15, 1995)

Banking on Nonbank Acquisitions, The Community Banker 46 (Second Quarter 1995)

Fundamental Rules For Bank Merger Transactions Remain Unchanged After Paramount, in Banking Expansion Institute, Thirteenth Annual (Aspen Law & Business 1995) (with Herlihy, et al.)

Bank and Thrift Mergers and Acquisitions -- 1994, in Securities Activities of Banks, Prentice-Hall Law & Business, Fourteenth Annual Institute (1994) (with Herlihy, et al.)

Stock Buybacks: Strategic, Legal and Fiduciary Issues, 8 Insights 10 (Nov. 1994) (with Herlihy et al.)

Banking Developments, Banking on Non-Bank Acquisitions and Current Issues in Bank Acquisitions, in Bank Mergers and Acquisitions, Practicing Law Institute (1994) (with Herlihy, et al.)

Current Issues in Bank Acquisitions, 7 Bank Acct'g & Fin. 44 (Spring 1994) (with Herlihy et al.)

Recent Deals Feature New Pricing Formulas, 13 Banking Pol. Rep. 2 (Apr. 4, 1994) (with Herlihy et al.)

M&A Strategies, 7 Bank Accounting & Finance 48 (Winter 1993- 94) (with Herlihy et al.)

Assessing the Current Bank Merger Environment: A Preparedness Checklist, 12 Banking Policy Report 1 (Oct. 18, 1993) (with Herlihy et al.)

Bank Mergers and Acquisitions -- 1993: A Year of Increasing Franchise Consolidation, in *Securities Activities of Banks*, Prentice-Hall Law & Business, 13th Annual Institute (1993) (with Herlihy, et al.)

Hostile Acquisition Overtures At Smaller Banks and Thrifts, 11 Bank & Corp. Gov. L. Rep. 47 (1993) (with Herlihy et al.)

Flexibility on Safety and Soundness, 3 Bank Director 3 (Third Quarter 1993) (with Wasserman)

Designing Bank Governance Structures, 12 Bank Policy Report (Apr. 19, 1993) (with Herlihy et al.)

Capital and Compliance Strategies in the Era of Prompt Corrective Action, in *The New Implementing Regulations Under FDICIA* (Prentice Hall 1992) (with Wasserman et al.)

1992 -- A Year of Continuing Financial Industry Consolidation: Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Twelfth Annual Institute (1992) (with Herlihy, et al.)

Bank Regulators Turn Up Intensity in Examination of Racial Discrimination in Lending Practices, 9 Bank & Corp. Governance L. Rep. 758 (December 1992) (with Stern et al.)

Meeting the Challenge of Loan Bias Scrutiny, Am. Banker (August 21, 1992) (with Stern et al.)

Investment Company Act Exemption Proposed, 11 Int'l Fin. L. Rev. 41 (July 1992) (with Robinson)

Dealing with Market Risks in Stock Mergers: Collars and Walk-aways, 6 Insights 4 (July 1992) (with Herlihy et al.)

Market Risks in Bank Mergers, 1 Bank Governance L. Rep. 1114 (July 1992) (with Herlihy et al.)

Racial Discrimination in Lending Practices, 1 Bank Gov. L. Rep. 1114 (July 1992) (with Stern et al.)

Disclosure of the Analyses Underlying Investment Banker Fairness Opinions, 6 Insights 11 (March 1992) (with Herlihy et al.)

Federal Reserve Board Approval Criteria for Bank Mergers, 7 Bank & Corp. Governance L. Rep. 45 (1992) (with Herlihy et al.)

Consensus Needed on Early Resolution's Legal Issues, Am. Banker (Mar. 25, 1992) (with Wasserman)

An Overview of Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Eleventh Annual Institute (1991) (with Herlihy et al.)

"The Greatest American Shambles": An Exchange, 38 *N Y Rev of Books*, 59 (June 13, 1991)

Management Buyouts and the Duties of Independent Directors to Shareholders and Creditors, in Corporate Deleveragings and Restructurings, Practising Law Institute (1991) (with Lederman et al.)

Liabilities Under Sections 11, 12, 15 and 17 of the Securities Act of 1933 and Sections 10, 18 and 20 of the Securities Exchange Act of 1934, in Introduction to Securities Law 1990, Practising Law Institute (1990) (with Vizcarrondo et al.)

Advising the Board of Directors of a Target Company Regarding Defensive Strategies, in Dynamics of Corporate Control IV, American Bar Association National Institute (1989) (with Fogelson)

State Takeover Statutes: A Fifty-State Survey (privately published) (1989) (with Robinson et al.)

The Reorganization Plan: Statutory Framework and Commercial Realities, in Business Reorganizations and Workouts, Law Journal Seminars-Press (1988) (with Koplow)

Working Papers

An Empirical Reassessment of MBO Bids: Techniques, Outcomes, and Delaware Corporate Law, Working Paper (October 2005)

Why Are Firms Sold? The Role of the Target CEO's Age, Tenure, And Share Ownership, Working Paper (October 2005) (with Reinier Kraakman)

The Legal Origins of the Politically Puzzling U.S. "Market" for Corporate Charters, Working Paper (October 2004)

The Power of Defenses, National Bureau of Economics Research Working Paper (July 2003) (with Lucian Arye Bebchuk and Guhan Subramanian)

CEO Incentives and M&A Activity in the 1990s: Stock Options and Real Options, Working Paper (March 2002) (with Reinier Kraakman)

An Index of the Contestability of Corporate Control: Studying Variation in Legal Takeover Vulnerability, Working Paper (June 1999)

**Exhibit B**

**Trial Testimony and Depositions since 1/1/05**

*Mason Capital, Ltd. v. Kaman Corp. et al.*, United States District Court, District of Connecticut, No. 3:05CV1470 (MRK), Deposition, 10/6/05, and Trial Testimony 10/7/05

*Newby v. Enron Corp. et al.*, United States District Court, Southern District of Texas, Civil Action No. H-01-3624, Deposition, 5/14/06, 5/15/06

*Starr International Co. v. American International Group, Inc.*, United States District Court, Southern District of New York, Civil Action No. 05 CV 6283, Deposition, 12/20/06

*Ginsburg v. Philadelphia Stock Exchange, Inc., et al.*, Court of Chancery, State of Delaware, C.A. No. 2202-C, Deposition, 6/7/07

*In re Cendant Corp. Sec. Litig.*, United States District Court, District of New Jersey, Civil Action No. 98-1664, Deposition, 10/2/07

*IMO Industries, Inc. v. Transamerica Corp., et al.*, Superior Court of New Jersey, Mercer Vicanage, Docket No. MER-L-2140-03, Deposition, 10/17/07, 10/18/07

*United Rentals, Inc. v. RAM Holdings, Inc. and RAM Acquisition Corp.*, Court of Chancery of the State of Delaware, Civil Action 3360, Deposition, 12/10/07

*Liberty Media Corp., LLC et al. v. Vivendi Universal S.A. et al.*, United States District Court, Southern District of New York, C.A. No. 03 CV 2175, Deposition, 3/31/08, 4/1/08

*Omnicare, Inc. v. UnitedHealth Group, Inc. et al.*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:06-CV-06235, Deposition, 6/5/08, 6/6/08

*Auerbach Acquisition Associates, Inc. v. Greg Daily et al.*, Superior Court of the State of California, County of Los Angeles, Case No. BC 285134, Deposition, 4/7/08, and Trial Testimony, 4/7/09, 4/8/09, 4/14/09, 4/15/09, 4/21/09, 4/22/09

*Selectica, Inc. v. Versata Enterprises, Inc. and Trilogy, Inc.*, Court of Chancery, State of Delaware, Docket No. 4121, Deposition 2/24/09, Trial Testimony, 4/29/09

*In re Petco Animal Supplies, Inc. Shareholder Lit.*, Superior Court of the State of California, County of San Diego, Case No. GIC 869399, Deposition, 5/13/09

20

**Exhibit C**

Transcript of Deposition of Gladwyn Goins dated Feb. 17-18, 2009 and exhibits

Transcript of Deposition of William F. Perkins dated Jan. 24, 2007 and exhibits

Transcript of Hearing Before Honorable Paul W. Bonapeel, U.S. Bankruptcy Court Judge, dated Apr. 10, 2008

Transcript of Deposition of Nelson Keith Bond, M.D. dated Apr. 21, 2006

Transcript of Deposition of Fitz N. Harper, Jr. dated Apr. 20, 2006

Transcript of Jury Trial Proceedings Before the Honorable Clarence Cooper dated May 12-13, 2008 (Testimony of William F. Perkins and Jacob Frenkel)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM F. PERKINS, in his capacity as Chapter 11 Trustee of International Management Associates, LLC and its affiliated debtors, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No. 1:08-CV-02673-JEC |
| v. | ) ) | |
| SMITH, GAMBRELL & RUSSELL, LLP and C. GLADWYN GOINS, | ) ) ) | |
| Defendants. | ) | |

I hereby certify that a copy of the above and foregoing Expert Report of Professor John

C. Coates, IV via E-Mail and by placing a copy of same in U.S. Mail, first class postage prepaid,

addressed as follows:

> H. Lamar Mixson
> mixson@bmelaw.com
> Nicole G. Iannarone
> Iannarone@bmelaw.com
> BONDURANT, MIXSON & ELMORE, LLP
> 3900 One Atlantic Center
> 1201 West Peachtree Street, NW
> Atlanta, GA 30309

This 18th day of May, 2009.

/s/ Samuel W. Wethern
Samuel W. Wethern